IRVIN FISHER AND GERTRUDE FISHER,

*vs.*

THE NEWS-JOURNAL COMPANY, a corporation of the State of Delaware, and MARION W. HOPKINS.

*New Castle, Sept. 3, 1941.*

48

*James R. Morford,* of Marvel & Morford, for complainants.

*Aaron Finger,* of Richards, Layton & Finger, for defendants.

THE VICE-CHANCELLOR: The principal question is whether, because of an alleged trade usage or custom and in the absence of a contract providing expressly therefor, the defendant newspaper publisher may be compelled to sell its papers to persons who have, without the knowledge or approval of the publisher, purchased the business of a retail newspaper distributor who theretofore bought papers from the publisher.

On or shortly before July 17, 1939, complainants bought the stock and merchandise of a store, and the newspaper business carried on by one Lebo in Newark, Delaware. The consideration was something less than $12,000.00, most of which complainants considered applicable to the newspaper business. This business was that of an independent retail distributor. There are many such distributors in Delaware and surrounding localities. They are not employees, but buy newspapers from the defendant publisher and others, and sell them to the public at newsstands, and by delivery to the homes of customers. Their profit comes from selling at a higher price than they pay for the papers. Lebo purchased the business from one Armstrong in 1938, who had purchased from one Green in 1929.

·After the sale to complainants, Lebo and the complainant Mrs. Fisher called at the office of the circulation manager of· the corporate defendant and made known that the sale had taken place. The circulation manager did not know complainants, and neither he nor apparently anyone else connected with the corporation had any previous knowledge that a sale was contemplated. The corporation declined to

contract to supply complainants with its papers, but continued for a week to send papers to Lebo at the store address, billed him for them, and collected payment from him.

On Saturday July 23, after unsuccessful efforts to communicate with Lebo, the corporate defendant informed Mrs. Fisher that thereafter no papers would be sent to Lebo, but that they would be distributed by another person. That other person was the defendant Hopkins. At that time, the corporation assigned no reason for its refusal to deal with complainants. However, the reason appears to be that the circulation manager became suspicious of the transaction from the start, due, among other things, to evasive answers of Mrs. Fisher to questions put to her; and that he suspected that complainants might have such connection with a competitive publisher that, in their hands, the interests of the defendant corporation might not be impartially promoted.

Beginning the following Monday, the defendant Hopkins undertook the business of distributor in Newark of the publications of The News-Journal Company. He engaged certain of the delivery boys previously employed by Lebo, and obtained from others the names or addresses of home delivery customers who had bought News-Journal papers from Lebo.

The publication and sale of newspapers being a private enterprise, a publisher can, except when limited by contract, choose the persons with whom it will deal, and thus determine for itself whether to sell or not to sell its papers to any person offering to buy them. *Philadelphia Record Co. v. Curtis-Martin Newspapers*, 305 *Pa.* 372, 157 *A.* 796; *Lepler v. Palmer*, 150 *Misc.* 546, 270 *N.Y.S.* 440; *Friedenberg, et al., v. Times Publishing Company,* 170 *La.* 3, 127 So. 345. Although the defendant publisher determined not to sell to complainants, they contend that by purchasing Lebo's business they acquired the right to compel this defendant to sell them its publications for the purposes of that business. They say that their

"* * * rights depend entirely upon the nature of Mr. Lebo's contract with News-Journal Company. Mr. Lebo's contract depends to a large extent upon the trade usages by which its incidents were established. * * *

"It cannot be denied (omitting entirely the elements and incidents added by usage) that there were contracts between Green and the News-Journal Company, Armstrong and the News-Journal Company, and Lebo and the News-Journal Company. Still omitting the usage incidents, this was simply a contract terminable at will by both parties between the publisher of newspapers and successive independent distributors whereby the publisher sold papers on a daily, weekly or monthly basis at wholesale rates and the distributor paid for the same as billed. Admittedly, there was nothing complex in this basic relationship.

"However, over a period of many years, there had grown up between this same publisher and its distributors similarly situated certain recognized trade usages by which certain incidents were added to that basic contractual relationship. Green, Armstrong and Lebo successively contracted with knowledge and upon the basis of those usages. * * *"

Complainants contend that one of the "added incidents of Lebo's (as well as Green's and Armstrong's) contract with News-Journal Company as so supplied by general and long continued trade usage" was "that the publisher was required to accept the new carrier [distributor] to whom a route [the business of selling and delivering publications to homes or offices in a particular territory] was sold", unless one or both of the following "causes" existed:

"(1) Failure to render efficient service to customers and subscribers.

"(2) Failure to pay the publisher's bills within a reasonable time after the same were rendered."

As to the statement that Green, Armstrong and Lebo contracted with knowledge and upon the basis of the alleged usages, I recall no evidence at all that Green had such knowledge or contracted upon such basis. On the other hand, it appears that both Armstrong and Lebo contracted upon a basis inconsistent with the usage asserted, for Armstrong testified that his understanding was that he "had to have permission of the papers" to sell the business, and

that he communicated this understanding to Lebo before the sale to him was consummated. This is further supported by testimony of the circulation manager of the defendant publisher.

Apart from this, and turning to a consideration of proof of the alleged custom or usage, we find that complainants say:

"In the instant case, the *factum probandum* is the 'right' of the publisher arbitrarily to withdraw its papers from a carrier. The trade usage is that the publisher does not have such a 'right' except in the case of either one or both of the two instances heretofore discussed. If, as the defendants contend, the 'right' is a matter of law rather than a matter of fact, then the sole question necessarily is: 'Is it customary for publishers arbitrarily to withdraw their requirements of papers from carriers?' * * *"

But the defendant publisher, for its case, does not seek to establish the existence of a usage or custom. Rather does it rely upon rights which exist in the absence of usage or custom. It is for complainants to prove a usage "certain, uniform, reasonable and general, and of long standing, or, at least, of such long standing as to have become so generally known, recognized and acted on by the trade, as to raise a fair presumption that the parties in entering into their engagements, did so with a silent reference to the usage, and a tacit agreement that their rights and responsibilities should be determined by it. * * *" *Mears & Son v. Waples,* 3 *Houst.* 581, 618, affirmed, 4 *Houst.* 62. In this, complainants have failed.

A number of their witnesses were asked questions of which the following is typical:

"By the general custom or usage in the newspaper trade, state whether, or not, a newspaper publisher who has been supplying a carrier's requirements of its papers for the carrier's routes and news stand sales, has the right arbitrarily to refuse to supply the requirements of its newspapers to one who has bought a carrier's routes and news stand?"

The answers (in the negative) were taken over defend-

ants' objection, with final ruling upon the admissibility reserved until after the hearing. The questions were clearly improper in that they necessarily elicit a conclusion of law, and the answers should not have been received. 7 *Wigmore on Evidence*, § 1954. This ruling is likewise applicable to other similar questions in which witnesses were asked to state the rights of persons in certain circumstances. Even if the answers be treated as admissible, they lose, in the light of convincing proofs of facts, any persuasive force which they might otherwise have.

Indeed, the evidence establishes conclusively, it seems to me, that there is no custom or usage of the character contended for. The record leaves no doubt that from time to time distributors in Delaware and elsewhere have sold their businesses, or delivery "routes", for substantial prices; and that in nearly all instances, the defendant publisher, as well as other publishers, have thereafter dealt with the transferees on the same terms as with the former distributors. But the record likewise leaves no doubt that in so dealing the publishers have done nothing more—or less—than exercise their fundamental right and privilege to choose the persons with whom they will deal, without expressly or impliedly limiting or qualifying that right and privilege. The fact that there have been numerous sales of delivery "routes" establishes nothing against the defendant publisher. *Hathaway v. Bennett,* 10 *N.Y.* 108, 61 *Am. Dec.* 739. Usually the publishers were notified of proposed sales prior to their consummation. The fact that some persons purchased "routes" without the knowledge of the publishers means no more than that they did so at the risk of finding themselves inacceptable to the publishers, and consequently unable to buy papers from them. Whether notified before or after the sale, the publishers approved in most cases and disapproved in a few, by word or act.

Complainants assert that in no instances were transferees refused papers except for two "causes", and that

now, the publishers have not the right to reject a transferee unless one or both of these "causes" exist. There is no evidence that the defendant publisher ever declared a policy of accepting all transferees unless objectionable upon the two grounds specified by complainants. Nor is there any evidence of a practice or usage of accepting transferees with whom the publisher, for reasons outside the scope of the two "causes", did not wish to deal. In view of the broad and fundamental right of choice which it undeniably had originally, it would be most unreasonable to assume that the publisher embarked upon a practice of dealing with persons objectionable to it for any cause whatever. The reasonable inference is rather that the publisher's acts of approval or disapproval were in the full exercise of its right, and that it dealt with whom it pleased. However, this has not been left to mere inference, for defendants have, by testimony which carries conviction, demonstrated that the policy and practice of the defendant publisher and others, with relation to distributors, has been such that they have preserved in its entirety their right to choose the persons with whom they will deal.

My conclusion is that the refusal of the defendant publisher to deal with complainants violated no right or duty owing to them.

The other aspect of the case, concerning Hopkins' obtaining customers' names and addresses from news boys, was not pressed separately in the briefs and will not be considered in view of the determination of the main complaint.

A decree accordingly will be advised.