Richard **PACIARONI** and **James Cassidy, Plaintiffs,**

v.

James **CRANE, Defendant.**

Court of Chancery of Delaware, New Castle County.

Submitted Aug. 24, 1979.

Decided Sept. 18, 1979.

---

Sidney Balick, of Aerenson & Balick, Wilmington, for Paciaroni.

Joseph A. Hurley, of Paul, Lukoff & Hurley, Wilmington, for Cassidy.

Melvyn I. Monzack, of Walsh, Monzack & Owens, Wilmington, for defendant.

## DECISION AFTER TRIAL

BROWN, Vice Chancellor.

This case presents the question of what is to be done with a valuable racehorse now

that the partnership that owns him has suffered a falling out among the partners. The precise issue for decision appears to be without legal precedent in view of the unusual factual setting in which the parties now find themselves. These same facts also make the decision for the Court a delicate one. The circumstances giving rise to this problem may be summarized as follows.

The animal whose destiny hangs in the balance is Black Ace, a 3-year old, standardbred racehorse. Black Ace is a pacer and is possessed of exceptional speed. He has been raced primarily in 3-year-old stake races. His purse winnings this year, as of this date, are $96,969. He is still eligible to compete in seven other stake races between now and the end of the racing season in early November. These include the prestigious Little Brown Jug in Delaware, Ohio, on September 20, and the Messenger at Roosevelt Raceway, New York, on October 27. The purse money for these remaining stake races totals more than $600,000.

Black Ace has so far distinguished himself as being one of the better 3-year-old pacers in the country. However, he has been unable to beat the two pacers generally rated as the best of the crop, namely, Sonsam and Hot Hitter. Testimony at trial would rank Black Ace presently as perhaps the fourth to sixth best 3-year-old pacer in the country this year. However, while he has yet to win a big one, his performances in the big races, against the top competition, have been credible.

On July 28 at Vernon Downs, a three-quarter mile track, Black Ace finished third to Sonsam and Hot Hitter in 1:54⅕, a mere ⅕ second off the winning time. All three horses broke the existing track record for 3-year olds by a considerable margin. On August 11, at the Adios Pace in Pittsburgh, in which he was permitted to participate by the Court, Black Ace finished fourth to Hot Hitter and Sonsam in the first heat, and third to Hot Hitter in the second. His times on a five-eighths mile, off

track, were 1:57 and 1:57⅘, in each case being only 5ths of a second off the winning times. On August 26 at the Canadian Prix d'Ete, another event in which he was permitted to participate by the Court while this litigation was ongoing, he placed second in 1:55⅘ and third to Hot Hitter in 1:54⅗. Hot Hitter's time of 1:54 established a new world record for a sophomore pacer on a five-eights mile track. The previous record was 1:54⅗, the time in which Black Ace traveled the distance.[1]

Thus, it appears that Black Ace has at least the potential on a given night to win a major stake race, a potential that is now enhanced by the fact one nemesis, Sonsam, will race no more this year as the result of an injury. This is significant for the following reason. The testimony at trial places a current value on Black Ace of approximately $500,000. Should he be able to win one or more of the remaining major stakes, he could in all likelihood be syndicated for two to four times that amount. Or so the testimony goes.

Consequently, if he is permitted to complete the racing season, his value could increase substantially. Conversely, should he become injured or should his performances fall off, his value could decrease significantly or perhaps become nil. Such is one of the hazards that goes with the ownership of racehorses. And it is this circumstance which lies at the heart of the present controversy. Having thus set the stage, I turn to the facts and legal principles which must govern the outcome.

The parties to this action are the plaintiffs Richard Paciaroni and James Cassidy, who own a 50 per cent and 25 per cent interest in Black Ace respectively, and the defendant James Crane, who owns the remaining 25 per cent. Crane is also a trainer of standardbred horses who has enjoyed considerable success over his 20 years in the business, particularly with regard to selecting yearlings and developing them into successful racehorses. His most notable suc-

---

1. Since the commencement of the drafting of this decision, the Court, again after a hearing and again over the objection of the defendant, permitted Black Ace to race in a less prestigious stake at Scioto Downs on September 8. He won the race in a time of 1:57³/₅.

cess in the selection and development process was the horse Nero, which was syndicated for $3.6 million. There is no question or issue here as to Crane's competence and ability as a trainer. Until the final act on the part of Paciaroni and Cassidy which gave rise to this litigation, Crane has been the sole trainer, as well as the occasional driver, of Black Ace.

The business relationship between the parties came into being during the fall of 1977. Cassidy and Crane were casual acquaintances. It was suggested that they buy a horse together. Cassidy brought Paciaroni and a fourth party into the picture. Crane attended horse sales in both Philadelphia and Lexington, Kentucky, with a view toward purchasing a yearling for the group. Although they bid on at least one, they were unsuccessful. Crane and Cassidy next attended a sale in Harrisburg, Pennsylvania. It was there that Black Ace was selected and bid in at a price of $35,000. The four men each contributed equally to the purchase price. Crane took the horse to his facilities in Aiken, South Carolina, and entered into the breaking and training process. As a 2-year old, Black Ace started nine races, winning three and placing second in three.

As to the nature of the arrangement between the four parties, it was informal at best. There was no written agreement. Each owned a 25 per cent interest. It was understood that Crane was to be the trainer and that he would be in charge of the day-to-day supervision of the horse, including the selection of his equipment, his rigging, his training, etc. It was also understood, although apparently without any formal discussion, that all would be consulted with regard to the selection of drivers, the races in which the horse would be entered and other decisions of major consequence. In practice, this was done—with perhaps a minor misunderstanding here and there. All participated in selecting the stake races in which the horse was to be entered, although the recommendations of Crane were apparently followed because of his superior knowledge on the subject. Along the way, Paciaroni bought out the interest of the

fourth party to the venture, thus giving him his 50 per cent ownership interest. Prior to the summer of 1979 there is no indication of any type of problem arising that was not worked out amicably between Paciaroni, Cassidy and Crane. In other words, there were no irreconcilable confrontations which had to be decided by the vote of two of the owners over that of the other.

At this point it seems fitting to note that all three parties agree that their relationship with each other was that of a partnership. The business of the partnership was to own and race Black Ace for profit, with the partners to share in the profits or losses in proportion to their ownership interests. As trainer, Crane billed for and was paid for his services. He was also paid for the cost of supplies, equipment, veterinary care, etc. However, as a 25 percent partner, he bore his 25 percent share of these expenses. This was also understood from the outset.

By early 1979 the signs of dissension that inevitably seem to develop between trainer and owners began to appear. The horse apparently has a ring bone condition. He began to manifest problems on the track. Paciaroni and Cassidy felt that he should be examined by veterinarians other than the one relied upon by Crane. Crane was not enthusiastic for this. Eventually, at the insistence of Paciaroni and Cassidy, Crane took the horse to New Bolton Center where he was examined by one of the top horse veterinarians in the East. It was the recommendation of the latter that the angle of the hooves be increased so as to relieve the pressure on the rear part of the hoof. Crane, however, flatly refused to do this. As an alternative, the New Bolton personnel recommended squaring the hooves. Crane agreed with this and did so.

Nonetheless, Paciaroni and Cassidy were obviously soured by Crane's refusal to heed the expert advice. Thereafter, in June, the horse began pulling first on one line and then on the other and was trying to go over the hub rail. As a result the decision was made not to start him at a major stake race at Brandywine Raceway. There was some

disharmony between the parties surrounding this. Later, in July, Black Ace fell to his knees in the stretch of a race at the Meadowlands, taking two other horses out of contention along with him. He failed to finish the race and Paciaroni and Cassidy were concerned that they had almost lost him. They apparently attributed this to Crane's refusal to follow the advice of the New Bolton veterinarian.

Following the Meadowlands incident, the parties met and discussed the situation, with Cassidy and Paciaroni showing their displeasure. The meeting concluded with tensions seemingly soothed. However, that same evening, Crane advised that he felt that they should discontinue their business relationship and wind up their mutual affairs. He denies that he gave any indication of surrendering his role as the trainer of Black Ace. In fact, he was still acting as trainer when Black Ace raced at Vernon Downs some two weeks later.

Paciaroni and Cassidy responded by directing Crane, by telegram dated July 26, to turn the horse over to another trainer immediately following the July 28 race at Vernon Downs. Crane refused to deliver him to the first new trainer designated. At the other partners' direction, however, and upon the advice of counsel, he did eventually deliver the horse to James F. Larente, a trainer and driver of some 30 years experience and one whose expertise in the racing business is conceded. In so doing, however, Crane retained the eligibility papers to Black Ace, without which the horse cannot be raced. This suit followed, with Paciaroni and Cassidy seeking injunctive relief to compel Crane to surrender the eligibility papers, and with Crane seeking the appointment of a receiver for the partnership so as to sell the horse and thus liquidate the partnership asset as soon as possible and to control his activities in the meantime.

Since the institution of this suit, the Court has refused to permit Black Ace to race in a stake race at Vernon Downs. I have, however, allowed him to race in the Adios and the Prix d'Ete as noted previously. His efforts in these two events have gained him two seconds, a third and a fourth place finish, winning some $35,000 [2] in purse money in the process. Thus, to some extent, it seems that the Court has been unwittingly acting as an interim receiver insofar as racing decisions are concerned. With seven stake races still remaining, this is a position which must be abdicated with all due haste. Thus do we arrive at the issues and contentions of the parties.

The positions taken by Paciaroni and Cassidy are not totally consistent, although they are not significantly divergent. Paciaroni feels that either the partnership has already been dissolved by act of the partners, or that it should be formally dissolved by order of the Court as part of this proceeding. He considers the sale of the horse to be a necessary result either way. Cassidy takes the position that the partnership has not yet been dissolved. He harbors this view because he feels that the decision of him and Paciaroni to give the horse to a new trainer constituted nothing more than a partnership decision to terminate Crane as trainer, and not one to either voluntarily terminate the partnership relationship or to expel Crane from the partnership business.

Cassidy, like Paciaroni, concedes that the horse must be sold so as to eventually settle affairs between the partners. (This is due to the fact that the partners have been unable to reach any agreement as to one side buying out the interests of the other.) However, both Paciaroni and Cassidy take the position that Black Ace should be permitted to participate in the remaining 1979 stake races for which he is eligible, at least for so long as he is fit and able to race. Whether it be for the reason advanced by Cassidy, namely, that the partnership still exists until the completion of those stake races agreed upon by all three partners, or for the reason suggested by Paciaroni, that participation in the stake races for which the horse has been entered (and as to which partial stake payments have already been

made) should be permitted as part of the normal post-dissolution winding up of unfinished partnership business, the underlying premise for each argument is the same. Both take the position that as the combined owners of a 75 per cent interest in the partnership, their decision, being that of the majority, is controlling. They argue that in the absence of any agreement to the contrary, the will of the majority governs partnership affairs. Thus they fail to see how Crane, with only a 25 per cent interest, can legally withhold the eligibility papers so as to thwart the will of the majority and deprive the partnership—whether it be ongoing or in a winding up status—of the ability to accumulate purse money and to potentially enhance the value of the horse by continuing to race him in those few remaining stake races for which he is eligible.

As for Crane, he agrees with Paciaroni that a dissolution of the partnership has taken place and that the horse must be sold in order to wind up partnership affairs. However, in the meantime, he strenuously objects to the horse being raced by Paciaroni and Cassidy under the direction of any trainer other than himself. He would prefer to have the horse sold as soon as possible. (In fact, he originally sought to have him sold at auction at a sale held at the Meadowlands on August 28, 1979, an application that was denied, among other reasons, due to the lack of time available to the Court prior to the sale date to thoroughly consider the situation.) At the same time, he is not opposed to having Black Ace continue to race in the scheduled stake races provided that he has some assurance he will not be harmed in the process. (This stems from the fact that Larente, with the approval of Paciaroni and Cassidy, has made adjustments to the horse and his equipment which Crane opposes.) To this end, Crane asks that a receiver be appointed to make all decisions regarding the care, custody, training and entry of Black Ace in the various races until such time as he may be ordered sold by the Court.

In support of his position that Paciaroni and Cassidy have no right to take the horse from him and to race him through another trainer, Crane contends that since it was understood from the beginning, that he, as a partner, would also be the trainer of any horse purchased by the partnership, then it was within the initial contemplation of all that he would be, in effect, the managing partner of the partnership. He has offered testimony designed to show that it is the prevailing custom and practice in the harness racing industry that where a trainer also purchases an ownership interest in a horse from the outset, and particularly with regard to a yearling, it is commonly understood that the trainer-owner has the right to control the horse even though his ownership interest may be less than 50 per cent. He says that no trainer would put up a considerable sum of his own money toward the purchase price of a horse if there was any thought that the remaining owners, over his objection, could take the horse from him and turn him over to another trainer at any time they saw fit, thus depriving the trainer-owner of the fruits of his labor and requiring him, against his will, to pay training expenses to a competitor. For this reason, Crane says that the 75 per cent interests of Paciaroni and Cassidy do not govern the fortunes of Black Ace, even though their collective views might otherwise constitute the will of the majority.

As noted at the outset of this decision, there appears to be no precedents which approach the particular problem presented here. At least the parties have offered none. In fact, the parties have mutually conceded that the outcome should be governed by the provisions of the Uniform Partnership Act as made a part of Delaware law at 6 *Del.C.* § 1501 et seq. Having no reasonable alternative, I shall attempt to analyze the situation under those statutes.

To begin with, the existence of the partnership is conceded by the parties. There was no written agreement. It was not formed for the purpose of any solitary undertaking. There was no time specified for the duration of the relationship. I therefore conclude that we are dealing with a partnership at will. 59 *Am.Jur.2d,* Partnership § 30.

■ Any partnership, once formed, continues until it is dissolved and its affairs are thereafter wound up. In other words, the four significant events covering the life span of a partnership would appear to be formation, dissolution, winding up and termination. The dissolution of a partnership is defined as the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business. 6 *Del.C.* § 1529. A dissolution, however, does not terminate the partnership. Rather, the partnership continues until the winding up of partnership affairs is completed. 6 *Del.C.* § 1530.

The dissolution of a partnership can come about in two ways. It can be accomplished by the act of one or more of the partners, or by events, 6 *Del.C.* § 1531, or it can be decreed by a court upon the application of a partner for one of the reasons specified by statute, 6 *Del.C.* § 1532. On the facts of this matter, I find that there is no basis to reach a dissolution by court decree under § 1532. Moreover, I feel that a dissolution has already occurred as a result of the conduct of the partners.

By 6 *Del.C.* § 1531(1) it is provided that a dissolution is caused without violation of the agreement between the partners

"(b) By the express will of any partner when no definite term or particular undertaking is specified;

\* \* \* \* \* \*

"(d) By the expulsion of any partner from the business bona fide in accordance with such a power conferred by the agreement between the partners; . . ."

I had originally considered the possibility that § 1531(1)(d) governed the situation as a result of the July 26 telegram from Paciaroni and Cassidy directing Crane to surrender the horse after the completion of the July 28 race at Vernon Downs. Certainly, if Crane was the managing partner by industry custom, as he argues, the majority partners still would have had the power to dissolve the relationship and it would seem that this could have been done by expelling Crane from any further participation in the partnership business. In other words, if Crane's argument is correct, he would have had the right as managing partner to make all decisions concerning the horse so long as the partnership continued. At the same time, his authority as managing partner for this purpose could not give him the right also to continue the partnership for as long as he saw fit against the will of the 75 per cent partners. Thus, although they would have no say in the management of partnership affairs, the 75 per cent partners would nonetheless have had the power to dissolve the partnership, and one way to accomplish this would have been to expel the managing partner from further duties and from the control of partnership assets. And this would not be in violation of the partnership agreement even if Crane's version of it were accepted. However, for reasons set forth hereafter, I do not feel that Crane has established that he alone had the power to control Black Ace, and consequently I do not feel that § 1531(1)(d) provides the basis for dissolution.

At the same time, I do not feel this to be significant, because I think it clear that a dissolution has been accomplished by the express will of the partners under § 1531(1)(b). As noted, the partnership was for no definite term and it was not confined to any particular undertaking. As such, under § 1531(1)(b) it could be dissolved by the express will of any partner.

■ Following their meeting in July after Black Ace fell in the Meadowlands race, Crane made it clear that he wanted their partnership relation as owners of the horse to be terminated. Shortly thereafter, Paciaroni and Cassidy responded with their July 26 telegram to Crane, the content of which was as follows:

"MR AND MRS J CASSIDY AND MR AND MRS R PACIARONI TOGETHER REPRESENTING 75 PERCENT OWNERSHIP OF THE 3 YEAR OLD COLT 'BLACK ACE' HEREBY NOTIFY YOU THAT YOU ARE RELIEVED OF YOUR EMPLOYMENT AS TRAINER OF

'BLACK ACE' EFFECTIVE IMMEDIATELY FOLLOWING THE GAINES PACE AT VERNON DOWNS SATURDAY JULY 28 1979 AND YOU ARE TO TURN OVER CUSTODY OF SAID COLT IN GOOD AND SOUND CONDITION AT THAT TIME ALONG WITH ALL NECESSARY PAPERS AND EQUIPMENT TO PERSON OR PERSONS REPRESENTING CASSIDY'S AND PACIARONI'S"

While it might seem that the telegram was carefully worded so as to appear to relieve Crane of his duties as trainer, the fact that it also says that he is to surrender the horse to persons representing Paciaroni and Cassidy clearly indicates, I think, that Paciaroni and Cassidy had decided to go their separate way, without Crane. Nothing that transpired thereafter weakens this conclusion in any way. To the extent that there could be any doubt, it was certainly resolved as of the time that Crane petitioned this Court for the appointment of a receiver to sell the horse. However, I am of the view that the partnership was placed in a state of dissolution by the express will of the partners at least by July 26, 1979.

Having reached this conclusion, where does it leave matters? Obviously, the partnership is now in the winding up stage. 6 *Del.C.* § 1530. But how is it to be accomplished here, given the unusual nature of the primary partnership asset?

All three partners agree that the horse must be sold in order to wind up partnership affairs. The only dispute is as to when he must be sold and what is to be done with him in the meantime.

As noted previously, Paciaroni and Cassidy take the position that since the partnership relation continues until the time of termination and distribution of assets, then as a consequence the will of the majority of the partnership interests should control the manner of winding up. For this they rely on the following provisions of the Uniform Partnership Act found at 6 *Del.C.* § 1518:

"(5) All partners have equal rights in the management and conduct of the partnership business.

\* \* \* \* \* \*

"(8) Any difference arising as to ordinary matters connected with the partnership business may be decided by a majority of the partners; but no act in contravention of any agreement between the partners may be done rightfully without the consent of all the partners."

In particular, they rely on the first portion of § 1518(8) as giving them, as the majority, the right to have the horse finish the stake racing season under the guidance of Larente and over the objection of Crane.

However, as I see it, it is the latter portion of § 1518(8) on which Crane relies. Again, it is his argument that there is a prevailing custom in the harness racing business that a trainer who also owns an interest in a horse, even though it be less than a majority interest, has the right to train and control the racing of the horse so long as his ownership interest continues. He says that this custom forms a part of the oral agreement between him, Paciaroni and Cassidy, and that consequently any attempt by the latter to take charge of the horse by majority vote would be in contravention of the partnership agreement. In other words, he says that under the latter portion of § 1518(8) he cannot be removed as trainer and the horse given to another trainer without the consent of all three partners—and Crane does not give his consent.

Taking these contentions in reverse order, I find on the evidence that Crane has not established an industry custom to the extent that it would permit the Court to make it a part of the partnership agreement between the parties. I stress the fact that I am not necessarily finding that there is no such custom. I simply hold that on the evidence presented it has not been established.

The situation here bears similarity to that presented in *Fisher v. News-Journal Co.,* Del.Ch., 26 Del.Ch. 47, 21 A.2d 685 (1941). There the plaintiff purchased a newsstand and newspaper distribution business in Newark. The defendant newspaper there-

after chose not to sell newspapers to the plaintiff, but rather it elected to handle its sales and distribution through another. Plaintiff brought suit and sought to establish that it was a long continued trade usage that a newspaper publisher was required to accept a new carrier or distributor to whom a route or business had been sold unless the new owner either failed to render efficient service to customers or failed to pay the newspaper publisher's bills within a reasonable time.

The Court there found that the trade usage relied upon by the plaintiff had not been established. It was acknowledged that the record clearly revealed that routes and distributorships had been sold from time to time and that in nearly all instances the publisher had thereafter dealt with the transferees on the same terms they had with the former distributors. However, the fact that this normally occurred was equally consistent with the fact that the publishers had voluntarily elected to continue on with the new owners. It did not establish a trade custom that they were required to do so. The test was stated as follows at 21 A.2d 687:

"It is for [the] complainants to prove a usage 'certain, uniform, reasonable and general, and of long standing, or, at least, of such long standing as to have become so generally known, recognized and acted on by the trade, as to raise a fair presumption that the parties in entering into their engagements, did so with a silent reference to the usage, and a tacit agreement that their rights and responsibilities should be determined by it.' "

Here, as did the defendant in *Fisher v. News-Journal Co.*, Paciaroni and Cassidy disavow any knowledge of any such industry custom and usage as relied upon by Crane. To prove his point Crane has offered the testimony of several trainers and persons close to the harness racing business to establish that such a custom does exist. Included was the testimony of Rene Dervaes, former owner of the horse Nero mentioned earlier, that of Ross Hayter and Robert Styles, Jr., trainers and drivers of many

years experience, and that of Herve Filion, the leading trainer-driver in total races won and purse winnings for the past eight years.

However, when the basis for the testimony offered by all of these witnesses is examined closely, it reveals a common flaw. All state, in one form or another, that such an industry custom exists because they can recall of no situation where the majority owners have taken a horse away from a trainer-minority owner and given it to another trainer without the trainer-owner's consent.

■ While this may be completely accurate as a matter of fact, it does not necessarily establish a custom or usage that the majority owners could not make such a change over the trainer-owners's objection should they want to do so. The negative fact, i. e., that it has not been done, does not establish the affirmative conclusion, i. e., that it cannot be done because of established trade custom. It is an argument no stronger than that rejected in *Fisher v. News-Journal Co., supra,* that because publishers almost always accepted the transferee of a newspaper route or distributorship, there must have existed a trade usage that required them to do so. Crane's witnesses on this point were also in general agreement that impasses such as the one presented here are almost uniformly resolved by either the horse being sold with the agreement of all or by part of the owners buying out the interests of the others. Thus, whether or not such an industry custom does or does not exist within the business of harness racing will have to wait for another day. I simply hold that for the purpose of this proceeding, it has not been established by the evidence presented here.

■ Having thus disposed of Crane's contention that he has an absolute right to control Black Ace during the winding up process by virtue of the partnership agreement, I turn to the argument of Paciaroni and Cassidy that they have a similar right under § 1518(8) by virtue of constituting the majority interests. This argument I also reject. I do so because § 1518(8) permits a majority vote to decide any "differ-

ence arising as to ordinary matters connected with the partnership business." Under the exceptional circumstances of this case I do not view the difference between the parties to be one which has arisen in the ordinary course of partnership business. Quite the contrary. The partnership is dissolved. Crane is fearful that if the horse is allowed to continue racing with the changes made by Larente as authorized by Paciaroni and Cassidy, he may well suffer injury and decline from his present value before he can be sold, thus jeopardizing Crane's one-fourth interest. Crane is also fearful that his professional reputation will suffer if it becomes general knowledge that the horse he has developed has been taken from him by legal process and is being raced by another. Paciaroni and Cassidy, on the other hand, say that the horse should be raced because his value may well be increased thereby. They say that they have the once-in-a-lifetime opportunity to be the owners of a champion caliber racehorse. They say that they also have the right to seek to obtain the highest possible price for him when he is sold, something that can only be done if he finishes out his stake race season. This difference between the partners is hardly one which has arisen in the ordinary course of partnership business. Accordingly, I conclude that Paciaroni and Cassidy have no statutory right to wind up affairs simply because they can out vote Crane.

Thus, if neither side has a right to control the winding up process under the positions they have taken, where does this leave us? In my view, it throws matters into 6 *Del.C.* § 1537. That statute reads as follows:

"Unless otherwise agreed *the partners who have not wrongfully dissolved the partnership* or the legal representative of the last surviving partner, not bankrupt, has the right to wind up the partnership affairs; provided, however, that any partner, his legal representative or his assignee, *upon cause shown, may obtain winding up by the court.*" (Emphasis added.)

Since I have found that the partnership was dissolved under § 1531(1)(b), it follows that the partnership was not wrongfully dissolved. (Regardless of whether or not this is a necessary condition to seek winding up by the Court, I find it to be present here.) On the present status of the matter, then, I conclude that both sides to this controversy have sought a winding up of partnership affairs by the Court—Crane by asking for a receiver to control the horse and to bring about his sale, and Paciaroni and Cassidy by seeking authority to race the horse in the remaining seven stake races for which he is eligible in an effort to accumulate additional winnings for the partnership and to hopefully increase his value for purposes of sale in the fall. This being so, what authority does the Court possess?

■ To begin with, there is no power to compel one side to the controversy to buy out the interests of the other. Since between themselves the parties have placed a value of $500,000 on Black Ace, it might be thought tempting by some to require Paciaroni and Cassidy to purchase Crane's 25 per cent interest since they are the ones who desire to keep on racing. However, it was held in *Trincia v. Testardi,* Del.Ch., 30 Del.Ch. 42, 57 A.2d 638 (1948) that this Court could not force a surviving partner to buy a deceased partner's interest. The same principle would apply here since the only point of distinction is the event which brought about the dissolution.

■ Moreover, it is generally accepted that once dissolution occurs, the partnership continues only to the extent necessary to close out affairs and complete transactions begun but not then finished. It is not generally contemplated that new business will be generated or that new contractual commitments will be made. Compare, 6 *Del.C.* §§ 1533, 1535. This, in principle, would work against permitting the balances due on the various stake payments to be made so as to permit Black Ace to participate in the remaining few races for which he is eligible. However, in Delaware, there have been exceptions to this.

In *Trincia v. Testardi, supra,* because of the acrimonious nature of the dispute be-

tween the parties and the complications involved in winding up, the Court found it appropriate to appoint a receiver "to take control of the business with authority to procure the continued operation of the business until he can recommend an advantageous disposition of the assets." 57 A.2d 645. And in *Hurley v. Hurley*, Del.Ch., 33 Del.Ch. 231, 91 A.2d 674 (1952) the Chancellor found that it was not improper for the two surviving partners to have continued a building supply business for some three years after the death of the third partner where their purpose had been to seek a better price upon liquidation. As stated at 91 A.2d 675:

> "I believe that the defendants were entitled to wind up the partnership affairs by liquidating the assets over a period of time rather than by an immediate forced sale. There is no evidence that the defendants took an unreasonably long time in winding up the business. In fact the uncontradicted testimony was to the effect that substantially more was realized by proceeding in the manner indicated rather than by an immediate liquidation."

While the Court in *Hurley* had the benefit of hindsight, it seems that a principle can be drawn from these two decisions, namely, that where, because of the nature of the partnership business, a better price upon final liquidation is likely to be obtained by the temporary continuation of the business, it is permissible, during the winding up process, to have the business continue to the degree necessary to preserve or enhance its value upon liquidation, provided that such continuation is done in good faith with the intent to bring affairs to a conclusion as soon as reasonably possible. And one way to accomplish this is through an application to the Court for a winding up under § 1537, which carries with it the power of the Court to appoint a receiver for that purpose. With this in mind, I briefly review the elements involved in this situation.

The business purpose of the partnership was to own and race Black Ace for profit. The horse was bred to race. He has the ability to be competitive with the top pacers in the country. He is currently "racing fit" according to the evidence. He has at best only seven more races to go over a period of the next six weeks, after which time there are established horse sales at which he can be disposed of to the highest bidder. The purse money for these remaining stake races is substantial. The fact that he could possibly sustain a disabling injury during this six-week period appears to be no greater than it was when the season commenced. Admittedly, an injury could occur at any time. But this is a fact of racing life which all owners and trainers are forced to accept. And the remaining stake races are races in which all three partners originally intended that he would compete, if able.

The alternative to racing on through the remaining stakes would be to turn Black Act out to pasture until he can be placed in a suitable sale. The balance of his three-year-old racing season would be lost and his true potential might never be realized while he is owned by the partnership. While this might go to preserve whatever present value he now has, it would not seem to be the most plausible thing to do when the reason for which the horse exists is measured against the unique opportunities remaining available to him.

■ Under these circumstances, I conclude that the winding up of the partnership affairs should include the right to race Black Ace in some or all of the remaining 1979 stake races for which he is now eligible. The final question, then, is who shall be in charge of racing him.

On this point, I rule in favor of Paciaroni and Cassidy. They may, on behalf of the partnership, continue to race the horse through Larente, subject, however, to the conditions hereafter set forth. In reaching this decision, I must confess that I have a great deal of sympathy for James Crane. Nor would I be inclined to take this action except for the extraordinary circumstances prevailing and the brief time for which it will endure. Crane is the one who helped select Black Ace and he is the one who got him this far. I have not the slightest doubt

that his opinions as to what was best for the horse were sincere. He appears to be a sincere and able person. Nor can I say that his opinions were wrong. But the differences of opinion that, according to Mark Twain, make for good horse races, also breed disputes between trainers and owners. And in this case, I have no doubt that Paciaroni and Cassidy, based on the information available to them, have also acted in what they thought to be the best interests of the horse and the partnership enterprise.

Nonetheless, when such an impasse occurs, someone must come up short regardless of the good intentions that brought it about in the first place. On the facts of this case, it must be Crane. At the same time, he does have a monetary interest in the partnership assets which must be protected if Paciaroni and Cassidy are to be permitted to test the whims of providence in the name of the partnership during the next six weeks. Accordingly, I make the following ruling.

(1) As a part of winding up the affairs of the partnership, Paciaroni and Cassidy may act as the liquidating partners and may cause Black Ace to race in some or all of the seven remaining stake races, provided, however, that they shall first post security or corporate surety in the sum of $100,000 so as to secure to Crane his share of the value of the partnership asset as established by the evidence at trial. This does not mean that Crane's interest in the partnership is established at that figure. There may be other assets and undoubtedly there are liabilities. It is simply to protect Crane against the possibility that during the winding up process that much of his present interest in the value of the partnership property may be lost or diminished by destruction or injury to the horse prior to final liquidation as a result of continuing to race him. This appears no different in principle than the requirement made by statute in some states that surviving partners give bond in favor of the estate of a deceased partner during the period of winding up.

(2) If Paciaroni and Cassidy are unable or unwilling to meet this condition, then they shall forego the right to act as liquidating partners. In that event, each party, within seven days, shall submit to the Court the names of two persons who they feel qualified, and who they know to be willing, to act as receiver for the winding up of partnership affairs, including the supervision and control of the horse for the remainder of this racing season. I shall then consider designating one such person as receiver.

(3) In the event no suitable person can be found to act as receiver, or in the event that the Court should deem it unwise to appoint any person from the names so submitted, then the Court reserves the power to terminate any further racing by the horse and to require that he simply be maintained and cared for until such time as he can be sold as a part of the final liquidation of the partnership.

(4) The Court further reserves jurisdiction to take such further action with regards to the partnership interests as may appear necessary.

As to the rulings hereby set forth, IT IS SO ORDERED AND DECREED.