# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| COMERICA BANK, a Texas Banking Association, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 9707-CB |
| GLOBAL PAYMENTS DIRECT, INC., a New York Corporation, | ) ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| GLOBAL PAYMENTS COMERICA ALLIANCE, L.L.C., a Delaware Limited Liability Company, | ) ) ) | |
| Nominal Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: July 22, 2014
Date Decided: August 1, 2014

Daniel A. Dreisbach, Thomas A. Uebler and Sarah A. Clark of Richards, Layton & Finger, P.A., Wilmington, DE; Howard J. Roin and Laura R. Hammargren of Mayer Brown LLP, Chicago, Illinois, Attorneys for Plaintiff.

Peter B. Ladig, Meghan A. Adams and Kyle E. Gay of Morris James LLP, Wilmington, DE; John P. Brumbaugh and Claire Carothers Oates of King & Spalding LLP, Atlanta, GA, Attorneys for Defendants.

**BOUCHARD, C.**

## I. INTRODUCTION

This opinion is the second chapter in the business divorce between plaintiff Comerica Bank ("Comerica") and defendant Global Payments Direct, Inc. ("Global" or "Global Direct") concerning the joint venture they established in 1996 to process credit and debit card transactions called Global Payments Comerica Alliance, L.L.C. ("Alliance"). On July 21, 2014, following an expedited trial held on July 14-15, I issued an opinion in which I concluded that certain exclusivity and non-competition obligations in the parties' agreements ended on January 14, 2014, and that Alliance was dissolved on May 14, 2014. These rulings were implemented in an Order and Partial Final Judgment entered on July 21, 2014, granting judgment in favor of Comerica and against Global on Counts I and II of the Verified Complaint.

In this opinion, I address Count III of the Verified Complaint,[1] which involves two issues: (1) is Comerica contractually entitled to receive certain information and assistance it has requested to effectuate its transition to a new payment processor and, if so, is Global required to incur the expense of assisting in the transfer of this information to the new payment processor, and (2) should the Court intervene in the wind up of Alliance and appoint a liquidating trustee. For the reasons set forth below, I find that Comerica is entitled to receive the information it has requested in connection with the wind up of Alliance but that the expense of assisting in the transfer of such information to Comerica

---

[1] The remaining two claims in the Verified Complaints, Counts IV-V, seek damages against Global. These claims were not the subject of the expedited trial and will be addressed in the ordinary course.

and its new payment processor should be borne by Alliance as an expense of the wind up. I also conclude that cause exists for the Court to intervene in the wind up and to appoint a liquidating trustee to oversee that process to ensure that it is completed promptly and in an orderly manner.

## II.    BACKGROUND[2]

As explained in my July 21, 2014 Memorandum Opinion, the contractual relationship between the parties is largely defined in three interrelated agreements that were entered simultaneously in March 1996, with some subsequent modifications: the LLC Agreement, the Service Agreement and the Contribution Agreement. The provisions of these agreements relevant to Count III are discussed in Section III below. They concern the parties' obligations upon the dissolution of Alliance, which occurred on May 14, 2014.

Comerica and Global are the only two Members of Alliance. Global holds a 51% membership interest. Comerica holds a 49% membership interest.[3] The LLC Agreement provides for Alliance to be managed by its two Members, acting through their Representatives.[4] Global has three Representatives. Comerica has two Representatives.[5]

---

[2] The Pre-trial Stipulation and Order is cited as "PTO." Joint trial exhibits are cited as "JX." The trial transcript is cited as "Trial Tr."

[3] PTO § II, ¶ 4.

[4] JX 5 § 8.1.

[5] PTO § II, ¶ 5.

The principal asset of Alliance is its portfolio of agreements with merchant customers (the "Merchant Portfolio"). Comerica, Global and each merchant are parties to merchant agreements, which generally contemplate processing credit card transactions for the merchants in exchange for a series of fees.[6]

During the wind up process, the Merchant Portfolio is to be divided by "mutual decision" of the Members or, in the absence of agreement, pursuant to a formula and then distributed "in kind" in accordance with the Members' 51/49 percentage interests.[7] The LLC Agreement provides that this "Equitable Division" includes the "right, title, benefit and interest in [Alliance's] merchant agreements."[8]

During the trial of this matter held on July 14-15, I heard testimony concerning the parties' interactions since October 2013, when Comerica informed Global of its intention to terminate the Service Agreement, and the process of converting data for the merchant agreements to be assigned to Comerica as a result of Alliance's dissolution from the system Global manages for Alliance to a new payment processor. Four witnesses testified on these matters: (1) Bridgit C. Chayt, Comerica's Executive Vice President of Treasury Management and Business Deposit Services; (2) Kurt A. Schaeffer, Global's Senior Vice President of Worldwide Operations; (3) Donald Bruce Nanton, Global's

---

[6] Trial Tr. 160 (Schaeffer).

[7] JX 5 § 15.5.

[8] *Id.*

4

Senior Vice President of Core Processing and Integrations; and (4) David L. Green, General Counsel of Global Payments, Inc., Global's parent company.

### A.    The Parties' Interactions since October 2013

In early 2013, Comerica initiated conversations with Global to discuss the renegotiation of the Service Agreement, which would expire if not renewed on January 31, 2014.[9]  On October 22, 2013, after the parties had been unable to reach mutually agreeable renewal terms, "Comerica advised Global Direct in writing that it would not renew the Service Agreement" and initiated a request for proposals (RFP) for a new payment processor relationship.[10]

The next day, on October 23, 2013, Jeffrey S. Sloan, President and CEO of Global, sent Comerica a letter proposing to renew the Service Agreement on certain terms if Comerica agreed not to pursue an RFP process.[11]  On October 25, 2013, Comerica told Global it would not withdraw its notice of non-renewal of the Service Agreement and encouraged Global to participate in the RFP process.[12]

On or about October 30, 2013, Vin Perelli, second in command to Sloan at Global, directed that "Comerica's access to the Merchant Accounting System" (known as "MAS") be turned off.[13]  The MAS system is "the foundation of how the organization

---

[9] Trial Tr. 31-32 (Chayt).

[10] PTO § II, ¶ 13; Trial Tr. 33-35 (Chayt); JX 13.

[11] JX 14.

[12] JX 15.

[13] Trial Tr. 195 (Schaeffer).

5

manages transactions."[14] Global cut off Comerica's access to MAS for "between 24 and 48 hours," during which Comerica was unable to "troubleshoot for [its] customers" or engage in "risk monitoring."[15]  Sloan told Chayt that Global's decision to cut off Comerica's access to the MAS system related to the RFP process Comerica had initiated.[16]

Shortly after the MAS incident, Schaeffer, Perelli, and Green reviewed Global's internal protocols regarding Comerica and its customers.  Schaeffer was instructed to embark on "a fact-finding mission" to determine whether Comerica was receiving any "special benefits" from Global and then "to decide if [Global] wanted to continue [those benefits] or not."[17] Schaeffer reported to Green that Comerica's customers had been receiving priority when making inquiries to the call center and that a special email box had been established for Comerica employees to communicate with Global.[18]

On November 8, 2013, Global formally responded to Comerica's refusal to reconsider its decision to terminate the Service Agreement.  Global asserted that Comerica's exclusivity obligations under the Service Agreement "will continue to apply

---

[14] Trial Tr. 279 (Nanton).

[15] Trial Tr. 39-42 (Chayt).

[16] Trial Tr. 41 (Chayt).

[17] Trial Tr. 199 (Schaeffer).

[18] Trial Tr. 200-01 (Schaeffer).

during any . . . transition period, regardless of which party is requesting the transition services."[19]

Global participated in Comerica's RFP process, including the final presentations, but it did not score as one of the top two proposals and was not selected.[20] Comerica selected Vantiv, Inc. as its new payment processor.[21]

On January 10, 2014, Comerica notified Global that it had selected another payment processor and provided notice that "Comerica will be terminating and winding down its Joint Venture with Global."[22] Later that day, Green directed Comerica to address all "communications regarding these issues to [his] attention."[23]

After Comerica sent its January 10 letter, Sloan told Chayt that Global would "take the BIN [Bank Identification Number] to Wells [Fargo]," suggesting that Global would take the entire Alliance merchant portfolio for itself.[24] After making inquiries, Comerica determined that Global could not take the BIN because it was owned by Comerica.[25]

---

[19] JX 16.

[20] Trial Tr. 43 (Chayt).

[21] Trial Tr. 94-95 (Chayt). The agreement with Vantiv was not signed until June 2014. *Id.*

[22] JX 19; Trial Tr. 43-46 (Chayt).

[23] JX 20.

[24] Trial Tr. 47-49 (Chayt).

[25] Trial Tr. 50-51 (Chayt).

7

On January 17, 2014, Joe Fisher, Vice President – Corporate Development of Comerica Incorporated, asked Green to meet the next week to "exchange ideas of how to split the portfolio, your thoughts on your sales force, etc."[26] Green declined Fisher's request to meet and proposed setting up a call over two weeks later.[27]

On January 24, 2014, Green sent Lars C. Anderson, Vice Chairman of Comerica, a letter in which Global reiterated its position that Comerica's exclusivity obligations "will continue to apply for so long as either Global Payments or Comerica desires for the other to provide Services" under the Service Agreement.[28] In the same letter, Green requested that "Comerica continue to provide the Services under the [Service Agreement] during the transition period until we instruct you otherwise."[29]

On February 4, 2014, Fisher of Comerica sent Green of Global a proposal for splitting the Merchant Portfolio along with a draft of a cover letter from Chayt stating that, "[s]ince neither Global nor Comerica has stated any intention of selling its interest in the Alliance, we need to immediately begin discussions on dividing the Merchant Agreements and dissolving the Alliance."[30] In its letter, Comerica disagreed with

---

[26] JX 22.

[27] *Id.*

[28] JX 23.

[29] *Id.*

[30] JX 26; Trial Tr. 56-57 (Chayt). A signed version of this letter was sent to Global on February 7, 2014. JX 28.

8

Global's position on exclusivity.[31]  On February 6, 2014, Global rejected Comerica's February 4 merchant split proposal.[32]

On February 10, 2014, Chayt sent Green an internal memorandum circulated at Comerica explaining the process of transitioning "its merchant card processing vendor relationship to a different service provider."[33]  The memorandum noted that Comerica expects "to begin transitioning to the new provider as soon as possible."[34]

Also on February 10, 2014, Chayt forwarded Green a letter from Comerica to its bank customers explaining that Comerica would be changing processing service providers.[35]  Global objected to this letter because it was sent to all of Comerica's customers, including customers whose merchant services would be allocated to Global after the merchant split.[36]

On February 25, 2014, Green sent an email to Fisher of Comerica that revealed a sharp difference between the parties' expectations concerning the timing of Comerica's transition to a new processor.  Contrary to Comerica's expressed desire to transition as

---

[31] JX 26 ("For clarification, during this transition period, nothing in the Service Agreement or otherwise will restrict either party from purchasing merchant processing services or any other services from third parties for new merchant customers and/or require a party to refer to the Alliance any new potential merchant customers for credit card processing services.").

[32] Trial Tr. 59 (Chayt); JX 27.

[33] JX 29.

[34] *Id.*

[35] JX 30.

[36] JX 32; Trial Tr. 366-68 (Green).

soon as possible, Global took the approach that the transition did not need to be completed until January 31, 2015, the last day of the one-year transition period permitted by the Service Agreement,[37] and worked backwards from there:

> We are indeed working on a timetable to ensure that the dissolution and migration of the merchant base occurs within the 12 month transition period. We have a meeting on Friday with our technical folks to discuss their timing needs with regards to the actual migration of the merchants. *That will help us work backwards from January 31, 2015* to make sure we hit whatever deadlines we need to ensure a timely transition.[38]

On March 5, 2014, Chayt sent Sloan of Global a timeline for the transition contemplating that new Comerica customers would be processed by Comerica's new processing vendor by March 31, 2014, and that the parties would meet to develop a timeline for dissolution of the legacy portfolio during the week of March 10, 2014.[39]

On March 12, 2014, Green submitted Global's counterproposal, again working backwards from January 31, 2015, the latest extension date permitted by the Service Agreement. Using that date as an end point, Green stated that, "[f]ollowing discussions with our operations and technical teams, we estimate that we would need to identify Global Payments' share of the Alliance's merchants by no later than September 1, 2014."[40] Green also stated that Global intended to provide a proposed division of the Merchant Portfolio during the week of April 14 "as well as other proposed terms to

---

[37] JX 10 § 15(d).

[38] JX 33 (emphasis added).

[39] JX 34.

[40] JX 42.

govern the dissolution," and suggested that the parties meet on April 25 "to discuss the merchant division or any other issues Comerica is interested in discussing relating to the dissolution of the Alliance."[41]

In late March, Comerica learned that Global had "tripled the price" it was charging Alliance for processing services.[42] Chayt testified that these price increases contributed to a loss of Comerica's customers.[43]

On April 1, 2014, Green asked Comerica's General Counsel, DJ Culkar, for another copy of "the original proposed merchant split" Comerica had provided on February 4.[44] Culkar sent a new proposal the next day, on April 2, and reiterated Comerica's desire "to quickly negotiate a mutually agreeable division" of the Merchant Portfolio.[45]

On April 18, 2014, Global sent Comerica its first counterproposal to split the Merchant Portfolio.[46] Significantly, in a cover letter, Green stated that Global's proposal was contingent on a number of conditions, including that the parties agree (i) not to

---

[41] *Id.*

[42] Trial Tr. 61-62, 150-51 (Chayt). Under the Service Agreement, the parties are permitted to adjust the fees they charge each other for Services during the transition period "to reflect commercially reasonable rates." JX 10 § 15(d). No evidence was provided at trial concerning the reasonableness (or lack thereof) of Global's price increases.

[43] Trial Tr. 24 (Chayt).

[44] JX 43.

[45] JX 44.

[46] JX 45.

solicit merchants allocated to the other party until January 31, 2018, (ii) not to solicit or hire each other's current or former employees who provided payment processing services until January 31, 2018, (iii) to provide complete and general releases to each other, (iv) that they would pay for any assistance requested from the other party to migrate merchants to a new provider or bank sponsor, and (v) that the Service Agreement would remain in full force until January 31, 2015.[47]

On April 25, 2014, representatives of Global and Comerica met in Atlanta. Toward the end of the meeting, Comerica proffered another proposal to split the Merchant Portfolio.[48]

On May 14, 2014, after Global had indicated at least twice since the April 25 meeting that it needed more time to submit a counterproposal,[49] Comerica wrote Global saying it had given up on reaching an agreed-upon merchant split and had elected to formally dissolve Alliance.[50]  In the letter, Comerica demanded that the merchant agreements be divided "pursuant to Section 15.5 of the LLC Agreement,"[51] which sets forth a procedure for dividing the Merchant Portfolio if the parties cannot agree on a division.  The next day, on May 15, Global submitted a counterproposal to divide the

---

[47] *Id.*

[48] Trial Tr. 73-74 (Chayt).

[49] *See* JX 54 (April 30, 2014 email from Green); JX 57 (May 9, 2014 email from Green).

[50] JX 59.

[51] *Id.*

Merchant Portfolio, which remained "subject to the conditions outlined in [Green's] April 18, 2014 letter."[52]

On May 27, 2014, Comerica responded to Global's May 15 proposal, stating it would accept Global's proposed split of the Merchant Portfolio but rejecting all of the conditions Global had demanded in its April 18 and May 15 letters.[53]  On May 28, Green replied that Comerica's "offer" was "incomplete and lack[ed] several matters which must be agreed upon before the business of the Alliance can be completed."[54]  Green stated further that "it would be inadvisable for the parties to agree on a merchant division while maintaining starkly different interpretations on such key issues as exclusivity."[55]  "Less than 15 minutes" after receiving Global's May 28 letter, Comerica filed this lawsuit.[56]

In their pretrial stipulation, the parties stipulated that "[f]or the purposes of this trial, Comerica and Global Direct have agreed that they do not dispute the division of the Merchant Portfolio set forth in Global Direct's May 15, 2014 letter, and agreed that the division, without the other remaining parts of Global Direct's proposal, shall be the

---

[52] JX 60.

[53] JX 62.

[54] JX 63.

[55] *Id*.

[56] Trial Tr. 386 (Green).

division of the Merchant Portfolio."[57]  This proposed division covers "those merchants that were part of the Merchant Portfolio as of April 30, 2014."[58]

Notwithstanding the parties' stipulation, Global was equivocal at trial when asked whether it would commit unconditionally to implement the merchant split it proposed on May 15.  Global suggested it would not do so absent a court order:

> BY THE COURT:
> Q.     Mr. Green, as of today, is Global Direct in agreement on the split that you were referring to in your May 15[th] letter without the imposition of any other conditions or not?
> A.     We are.  Yes.  I mean, we're not withdrawing it.  It's there. We expect that the Court will say that's the merchant split, and we have no objection to that.
> Q.     With no conditionality.  That's what I'm trying to understand.
> A.     No.  I mean, it's hard to answer your question.  So if you look at our proposal, when we made the proposal, it was part of a larger sample proposal.  But as far as this proceeding is concerned, we're in agreement that that's the merchant split, period.[59]

As of the date of this Memorandum Opinion, the parties still had not agreed on a split of the Merchant Portfolio.

On June 19, 2014, about three weeks after filing this action, Comerica sent Global a five page letter describing information and assistance it wished to receive to migrate to its new processor the merchants to be allocated to Comerica (the "June 19 Letter").[60]  The June 19 Letter requested, "in electronic form, for its share of the Merchant Portfolio," six

---

[57] PTO § II, ¶ 24.

[58] PTO § II, ¶ 22.

[59] Trial Tr. 384-85 (Green).

[60] JX 76.

categories of information, each of which contained various subparts: (1) agreements with merchants, (2) credit files, (3) chargeback files, (4) Payment Card Industry (PCI) data security standards compliance files, (5) card association compliance and programs and (6) Merchant Accounting System (MAS) records concerning the merchants allocated to Comerica (collectively, the "Six Categories").[61] Global's witnesses confirmed that it was reasonable for Comerica to request these categories of information.[62]

The June 19 Letter further requested that Global provide "re-point charge instructions from old bank identification numbers . . . to Comerica's new numbers" and provide certain other services as part of the data conversion.[63] Comerica asserted in the June 19 Letter that Section 18.5 of the LLC Agreement required "Global Direct to provide all of the assistance Comerica seeks concerning transfer and migration."[64]

## B. The Data Conversion Process

In general terms, there are typically two steps to a data migration, a "back-end" conversion and a "front-end" conversion.[65] A back-end conversion[66] typically occurs first. It involves "the movement of all the of the back-office migration activities," the

---

[61] *Id.*

[62] Trial Tr. 305-06, 355-56 (Nanton); 229-35, 239-41, 243-56 (Schaeffer).

[63] JX 76.

[64] *Id.*

[65] Trial Tr. 174-75 (Schaeffer); 272-74 (Nanton).

[66] The words "migration" and "conversion" are interchangeable in this context. Trial Tr. 167 (Schaeffer).

15

primary one being the MAS system, which is the repository of most of the merchant information including pricing, merchant demographics and all of the components associated with the clearing and settlement of processing for a customer.[67] As part of a back-end migration, merchant data is transferred from an old platform and "mapped" onto a new platform.[68] The MAS system Global uses is managed by Hewlett-Packard.[69]

A "front-end" conversion focuses on the authorization process for transactions. The preferred method for accomplishing a front-end conversion is through an "*en masse*" transfer by redirecting transactions to a new bank identification number (BIN) or establishing a new BIN to move from one portfolio to another.[70] A much less desirable method for accomplishing a front-end conversion is through a piecemeal approach, either merchant-by-merchant or in groups of merchants.[71]

Nanton, who has been involved in thirteen data conversions at Global,[72] testified that Global's usual approach is "the same . . . that Comerica and Vantiv [Comerica's new processor] are proposing."[73] Specifically, Global typically does an *en masse* back-end

---

[67] Trial Tr. 274 (Nanton).

[68] Trial Tr. 273-75 (Nanton).

[69] Trial Tr. 279 (Nanton).

[70] Trial Tr. 273, 329 (Nanton); 192 (Schaeffer).

[71] Trial Tr. 138, 152 (Chayt); 190, 209-10 (Schaeffer); 329 (Nanton).

[72] Trial Tr. 269-70 (Nanton).

[73] Trial Tr. 314 (Nanton); *see also* Trial Tr. 188 (Schaeffer) (saying Comerica's requests were "similar to what [Global] would need or ask for" on the receiving end of a conversion).

conversion followed by a front-end conversion.[74] Nanton, who was Global's key witness on the technical aspects of data migration, testified at trial that the items Comerica requested in its June 19 Letter for both the back-end and front-end conversions would require four to six months to complete.[75]

Global contends it has no contractual obligation to provide any of the transfer and migration assistance Comerica requested in its June 19 Letter and that Comerica must pay Global for such services. Global admitted it feels no compulsion to hurry to get the conversion done and will act only "in ordinary course" to assist with the migration.[76]

## III. ANALYSIS

As this case developed through trial, Count III of Comerica's Verified Complaint implicates two issues: (1) is Comerica contractually entitled to receive the information and assistance requested in its June 19 Letter to effectuate its transition to a new payment processor and, if so, is Global required to incur the expense of assisting in the transfer of this information to the new payment processor, and (2) should the Court intervene in the wind up of Alliance and appoint a liquidating trustee.

For the reasons stated below, I find that Comerica is entitled to receive the Six Categories of information set forth in its June 19 Letter in connection with the wind up of Alliance but that the expense of assisting in the transfer of this information to Comerica

---

[74] Trial Tr. 191-92 (Schaeffer); 329-30 (Nanton).

[75] Trial Tr. 431 (Nanton) (in reference to both the back-end and front-end conversion components discussed in paragraph A.6 of the June 19 Letter: "In my experience, it would take somewhere between four and six months to do all of that work.").

[76] Trial Tr. 394-95, 397-400, 402 (Green); JX 71 ¶ 116 (Answer).

and its new processor should be borne by Alliance as an expense of the wind up. I also conclude that cause exists for the Court to intervene in the wind up and to appoint a liquidating trustee to ensure that the wind up is completed promptly and in an orderly manner.

**A.** **Comerica Is Entitled to Receive the Six Categories of Information Requested in its June 19 Letter and Alliance will Bear the Expense of Global's Assistance in the Data Migration**

Comerica makes two arguments relying on three provisions of the LLC and Service Agreements to support its position that Global is "contractually obligated to provide the transfer and migration assistance Comerica requests."[77] First, Comerica argues that Section 20(d) of the Service Agreement, read in conjunction with Section 21 of the LLC Agreement, "establish[es] Comerica's right to possess the information associated with its merchant agreements once they have been divided."[78] Second, Comerica argues that Section 18.5 of the LLC Agreement obligates Global to deliver this information and to provide Comerica the additional assistance requested in its June 19 Letter at Global's expense.[79] I address these arguments, in turn, taking into account other provisions of the parties' agreement relevant to these issues.

---

[77] Pl.'s Post-Trial Br. on Count III 26.

[78] *Id*. at 27.

[79] *Id*. at 29-35.

## 1.  Comerica's Right to Receive Information Associated with its Share of the Merchant Portfolio

Section 21.3 of the LLC Agreement, which is entitled "Liquidation of Company and Application of Proceeds," states, in relevant part, that:

> Upon the dissolution of the Company, the Members shall wind up the Company's affairs in accordance with the Delaware Act.  The Members are authorized to take any and all actions contemplated by the Delaware Act as permissible, including, without limitation . . . distributing the Property as promptly as is consistent with obtaining its fair value."[80]

The term "Property" is defined broadly in the LLC Agreement to mean "all assets owned by the Company and forming a part of or in any way related to or used in connection with the ownership, operation and management of the business of the Company, including, without limitation, all real and personal property."[81]

The principal asset of Alliance is the Merchant Portfolio.  During the wind up process, the Merchant Portfolio is to be distributed "in kind" in accordance with the Members' 51/49 percentage interests in an "Equitable Division."[82]  Section 15.5 of the LLC Agreement provides that this "Equitable Division" includes the "right, title, benefit and interest in [Alliance's] merchant agreements."[83]

Section 20 of the Service Agreement concerns proprietary information.  Section 20(d) provides that, "[i]n the event the parties divide the Merchant Portfolio Business of

---

[80] JX 5 § 21.3.1(c).

[81] *Id*. § 22, at 34.

[82] *Id*. § 15.5.

[83] *Id*.

19

Alliance, the portion of Alliance's proprietary and confidential information applicable to the Merchant Agreements assigned to each party shall be deemed owned by such party."[84] Section 20(a) of the Service Agreement explains what information is proprietary to Global, and thus will be retained by Global post-dissolution, and what information is propriety to Alliance, and thus is to be distributed to the members in the wind up in accordance with their respective shares of the Merchant Portfolio. It states:

> All standard software logic, financial information, marketing strategies, customer information, and product information provided by Global Direct under this Agreement is herein identified as proprietary and confidential to Global Direct and may not be copied or used in any way other than as specifically authorized in this Agreement. *All confidential and secret information relating to the trade secrets, know-how, ideas, business methods, finances, prices, business plans, marketing plans, development plans, manpower plans, sales targets, sales statistics, customer lists, customer relationships, computer systems, and computer software of Alliance is identified as proprietary and confidential to Alliance.*[85]

In my opinion, the foregoing provisions establish a contractual structure entitling Comerica to own and possess the information associated with its share of the Merchant Portfolio, including the Six Categories of information listed in the June 19 Letter, following the dissolution of Alliance. Moreover, to fulfill the purpose of the foregoing provisions, this information must be transferred to Comerica and its new processor in the wind up and Global, as the member exercising control over the Merchant Portfolio data,

---

[84] JX 10 § 20(d).

[85] *Id.* § 20(a). The parties further "acknowledge that all such proprietary information constitutes a valuable asset." *Id.* §20(b).

must take such actions as are reasonably necessary to effectuate this transfer.[86]  Section 24.9 of the LLC Agreement, a provision not referenced by either party to this litigation, contemplates this form of assistance and establishes as a default matter that the expense associated therewith is to be incurred by Alliance:

> Each Member shall cooperate with the other and execute and deliver to the other parties hereto such other instruments and documents *and take such other actions as may be reasonably requested from time to time by any other party hereto as necessary to carry out, evidence, and confirm the intended purposes of this Agreement.*  Nothing in this Section 24.9 shall be construed to require any Member to incur any costs or expenses in connection with any such undertaking unless such costs or expenses are paid by the Company.[87]

This brings me to Comerica's argument that the expense of transferring this information to Comerica should be borne by Global under Section 18.5 of the LLC Agreement.

### 2. Comerica is not Entitled to Shift the Cost of the Data Transfer to Global under Section 18.5 of LLC Agreement

Section 18.5 of the LLC Agreement states as follows:

> In any transaction under this Article whereby a . . . Member acquires an interest in the merchant agreement in an Equitable Division . . . all Members in an Equitable Division shall execute and deliver such assignments, instruments and documents as may be reasonably requested by . . . any Member in an Equitable Division to transfer the merchant agreements (and the full benefits and burdens thereof) to the . . . other

---

[86] I need not address whether the requests in paragraphs A.7-8 of Comerica's June 19 Letter (JX 76) are necessary or appropriate to complete the transfer of merchant data. The liquidating trustee I am appointing for the reasons set forth below can address these issues, if necessary.

[87] JX 5 § 24.9 (emphasis added).

Member in an Equitable Division consistent with applicable laws, rules and regulations.[88]

Relying on this provision, Comerica argues that Global is obligated to bear the expense of assisting in the transfer to Comerica of the Six Categories of information in the June 19 Letter, including the expense of migrating the data to its new payment processor.[89] More specifically, Comerica argues that by committing to "deliver . . . documents" that are "reasonably requested," Global committed to migrate all the merchant data accompanying Comerica's share of the merchant agreements to Comerica's new processor at Global's own expense.[90] I disagree.

Comerica has offered no legal authority interpreting a provision similar to Section 18.5. Instead, it asks that the words "deliver" and "documents" be interpreted separately from the rest of the provision, and offers definitions of those terms from Webster's dictionary and the federal rules governing discovery.[91] I do not agree that Global made a commitment to bear the cost of a data migration by agreeing to "deliver . . . documents" in Section 18.5. To isolate these terms from the rest of Section 18.5 would, in my

---

[88] *Id*. § 18.5. This provision is essentially identical to Section 18 (p) of the Service Agreement.

[89] Pl.'s Post-Trial Br. on Count III 26.

[90] Pl.'s Pre-Trial Br. 52 & n.16.

[91] Pl.'s Post-Trial Br. on Count III 32-33.

opinion, "distort the contract language in the [LLC Agreement] under the guise of construing it to give [Comerica] a contract right that simply is not there."[92]

The phrase "execute and deliver" in Section 18.5 appears to be a term of art referring to two related steps necessary historically to form an enforceable contract.[93] A contract is "executed" when "the agreement [is] signed in the name of the company by someone having authority to act on the company's behalf."[94] "Historically, delivery by one party to an agreement to the other has been effected by its physically handing over a signed counterpart of the agreement to a representative of the other party. Today . . . an opinion that the company has 'duly delivered' the agreement means that the company . . . delivered the agreement in a manner that under applicable law . . . had the effect of making the agreement a binding obligation of the company."[95] Delaware cases dating back to the middle of the Nineteenth Century have referenced the words "execute and deliver" in tandem in this manner.[96]

---

[92] *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 592 (Del. Ch. 2006) (then-Vice Chancellor Strine interpreting the phrase "indemnify and hold harmless" as unambiguous because the phrase is a "legal term of art").

[93] Donald W. Glazer, et al., *Glazer and Fitzgibbon on Legal Opinions: Drafting, Interpreting and Supporting Closing Opinions in Business Transactions* § 9.1.1, at 255 (3d ed. 2008) (analyzing the meaning of an opinion that an agreement has been "duly authorized, executed and delivered.") ("Glazer and Fitzgibbon").

[94] *Glazer and Fitzgibbon* § 9.4, at 280-81.

[95] *Glazer and Fitzgibbon* § 9.5, at 288.

[96] *See, e.g.*, *Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *5 (Del. Ch. May 7, 2014) (discussing restructuring agreement that required party to "execute and deliver such other instruments and perform such acts . . . as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements and

Consistent with the historical use of the phrase "execute and deliver," I find that the plain meaning of Section 18.5 is that each member is required to provide to the other such contractual documentation (such as an assignment and assumption agreement) as necessary to transfer title to those merchant agreements that are to be owned by the other member as a result of an Equitable Division of the Merchant Portfolio.

Focusing on the phrase "full benefits and burdens" that appears in a parenthetical in Section 18.5, Comerica argues that Global is obligated to assist with the data migration, at its own expense, because Comerica cannot realize the benefits of the merchant agreements without "the associated information."[97] Comerica has provided no legal authority to support this interpretation and offered no extrinsic evidence of the parties' intent concerning this phrase. In my opinion, construing the plain language of the provision, the phrase "full benefits and burdens" is used in Section 18.5 as the equivalent of saying that the receiving party shall receive all the rights (benefits) and

---

understandings of the Parties"); *Capital Gp. Cos., Inc. v. Armour*, 2004 WL 2521295 at *1 n.7 (Del. Ch. Oct. 29, 2004) (referring to a contract that a party must "execute and deliver . . . as a condition of any transfer"); *Tyre v. Andrews*, 104 A.2d 775, 776 (Del. Super. 1954) (plaintiff "executed and delivered" a valid general release); *Rogers v. Rogers*, 66 A. 374, 374 (Del. Super. 1907) (jury instructions regarding a note for a debt that a father "executed and delivered to his son"); *Lesley v. Shock*, 8 Del. 130, 130 (Del. 1865) (party "executes and delivers to the vendor his own bond and mortgage"). *See also* 23 Williston on Contracts § 61:37 (4th ed.) (stating that "obligors named in the contract who, with knowledge that those who did not sign are not bound, *execute and deliver* the contract to the obligee, and thereby induce the obligee to part with the consideration for the agreement" may not shift blame to the non-signing obligors as a defense.) (emphasis added).

[97] Post-Trial Oral Argument Tr. 18-20 (July 22, 2014).

assume all the obligations (burdens) of the transferred merchant agreement.[98]

Assuming one of the "benefits" of a merchant agreement is the right to own the data associated with that merchant, Section 18.5 says nothing about requiring a party to expend resources without being compensated to assist in the electronic migration of such data from one computer system to another. Instead, in my view, Section 18.5 requires only that a party provide the documentation necessary to assign to the other party the right to own the merchant agreements allocated to it in an Equitable Division, which assignment would include the right to the data associated with such merchant agreements.

My conclusion concerning the plain meaning of Section 18.5 is supported by two other provisions of the parties' agreements reflecting that they knew how to require each other's assistance and to address who would pay for such assistance when they wished to do so.[99] First, Section 24.9 of the LLC Agreement, discussed above, also uses the phrase

---

[98] The parties appear to have used the phrase "benefits and burdens" in this manner in the March 31, 1996 Service Agreement that was entered simultaneously with the LLC Agreement: "The parties hereby acknowledge and agree that [Alliance] is entitled to and has assumed all of the benefits and burdens under the Merchant Agreements . . . [Alliance] shall bear and shall be fully responsible (i) for the obligations of [Global] and [Comerica] under the New Merchant Agreements . . . and (vi) for all obligations of [Alliance] contained in this Agreement." JX 6 § 22.

[99] *See RCM LS II, LLC v. Lincoln Circle Assocs., LLC*, 2014 WL 3706618, at *8 (Del. Ch. July 28, 2014) ("The fact that the parties knew how to refer to closing when they wanted to implies that they used the term "effecting" to mean something more); *Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc.,* 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) (explaining that omission of a term in a contract "speaks volumes" when compared to included terms).

25

"execute and deliver" with reference to "instruments and documents."[100] Significantly, however, Section 24.9 goes further to expressly require each member to "take such other actions as may be reasonably requested from time to time by any other party hereto as necessary to carry out" the intended purposes of the LLC Agreement. This additional language, which conveys an obligation to do more than simply "execute and deliver" documentation, is missing from Section 18.5 of the LLC Agreement. Section 24.9 also allocates to Alliance the obligation to pay the costs or expenses incurred by a party to provide the assistance requested by the other party.

Second, the Contribution Agreement, which was entered simultaneously with the LLC Agreement, reflects that the parties knew how to specifically require "conversion assistance" when they wanted to do so and to establish who would pay for such assistance. Under the March 2006 Contribution Agreement, Comerica contributed to Alliance the "economic benefits" and "obligations" associated with its merchant agreements.[101] The Contribution Agreement contemplated a "Transition Period" during which Comerica, Global and Alliance agreed to "use their best efforts to effect an orderly transition" of the contributed "Merchant Portfolio Business."[102] Relevant here, Section

---

[100] The equivalent phrase in Section 18.5 is "assignments, instruments and documents." The inclusion of the additional word "assignments" in Section 18.5 (as opposed to the phrase "instruments and documents" in Section 24.9) further supports my view that the focus of Section 18.5 was to ensure the assignment of the rights and obligations of the merchant agreements.

[101] JX 7 § 1.1(a).

[102] *Id.* § 16.1; JX 7 at 1 (definition of "Merchant Portfolio"); JX 7 at 48 (definition of "Transition Period").

16.2 of the Contribution Agreement specifically required Comerica to assist in the conversion process to Global's system and explicitly addressed who would bear the expense of the conversion:

> In addition to the foregoing, Comerica shall undertake its best efforts to assist [Global], at the expense of [Global] in any conversion to enable [Global] to process and settle Credit Card Transactions on a system utilized by [Global] or any system utilized by any third party vendor of [Global].[103]

Significantly, Section 18.5 of the LLC Agreement does not contain any of this type of specificity.

\* \* \* \* \*

For the foregoing reasons, I conclude that Comerica is entitled to receive the Six Categories of information listed in the June 19 Letter and that Global must take such actions as are reasonably necessary to assist in transferring this information to Comerica and its new payment processor during the wind up, but that the costs and expenses incurred by Global in connection with this process shall be borne by Alliance.

## B.    Appointment of a Liquidating Trustee

Under the Delaware Limited Liability Company Act, this Court may wind up a company's affairs and appoint a liquidating trustee upon a showing of "cause" by any member:

> (a) Unless otherwise provided . . . a manager . . . may wind up the limited liability company's affairs; but the Court of Chancery, *upon cause shown*, may wind up the limited liability company's affairs upon application of any

---

[103] *Id*. § 16.2; *see also* JX 9 § 11.2 (December 2006 Contribution Agreement), JX 11 § 11.2 (May 2001 Contribution Agreement).

27

member or manager . . . and in connection therewith, may appoint a liquidating trustee.[104]

The term "cause" as used in this section is not defined in the Delaware Limited Liability Act. This Court has found cause to exist where the history of the parties suggest they would be unable or unwilling to undergo a wind up process in an orderly or timely manner.

For example, in *Spellman v. Katz*, a joint venture involving two physicians was dissolved.[105] The LLC agreement provided that "[u]pon the dissolution of the Company, one or more persons approved by Unanimous Vote shall have full authority and shall proceed without any unnecessary delay, to wind up the Company's business."[106] Interpreting *Paciaroni v. Crane*,[107] Vice Chancellor Noble found that "cause for judicial intervention into the winding up process may be shown by the demonstrated inability of the members to agree as to how winding up should proceed."[108] The Court went on to determine that the requisite cause to appoint a liquidating trustee had been established due to "the members' inability to implement this process, coupled with their contractual obligation under the Agreement to pursue winding up following dissolution."[109]

---

[104] 6 *Del. C.* § 18-803(a) (emphasis added).

[105] *Spellman v. Katz*, 2009 WL 418302 (Del. Ch. Feb. 6, 2009).

[106] *Id*. at *3.

[107] *Paciaroni v. Crane*, 408 A.2d 946 (Del. Ch. 1979).

[108] *Spellman*, at *4.

[109] *Id*.

28

Two years later, in *Phillips v. Hove*, Vice Chancellor Laster judicially dissolved a joint venture based on a finding that animosity between the parties, and their inability to agree on basic issues, created a deadlock.[110] The Court then appointed a liquidating trustee, finding that "[g]iven their history of disputes large and small, . . . the [LLC] members cannot wind down [the LLC] in an orderly or timely manner."[111]

Global asserts that this Court has appointed liquidating trustees only "where there is a deadlock among the parties entitled to conduct the wind-up, thereby rendering it impossible for the company to make any decision necessary in the wind up."[112] Global argues that Alliance is not deadlocked because "Global, as the holder of 51% of the interests in Alliance and the member entitled to appoint three of the five 'Representatives,' has the right to make any decisions necessary for the wind up."[113] Thus, according to Global, no liquidating trustee should be appointed.

The logical extension of Global's argument is that this Court is powerless to appoint a liquidating trustee under 6 *Del. C.* § 18-803(a) in a situation where one party may have the authority to control a wind up irrespective of how poorly or faithlessly that

---

[110] *Phillips v. Hove*, 2011 WL 4404034, at *26 (Del. Ch. Sept. 22, 2011).

[111] *Id*.

[112] Def.'s Post-Trial Br. on Count III 44; *see also* Post-Trial Oral Argument Tr. 83-84 (July 22, 2014) ("But the point, Your Honor, is we did a search, and we could not find [a case] in which there had not been a deadlock. . . . So if you look at these cases, Spellman versus Katz, Phillips versus Hove . . . the issue is not that there is a dispute between the parties so that they are not getting along. The issue is there is a dispute between the parties so they cannot get things done.").

[113] Def.'s Post-Trial Br. on Count III 44.

party performs its duties. I decline to take such a limited view of the cause requirement. Nothing in the statute requires a finding of deadlock as a prerequisite to this Court assuming control of the wind up process of a Delaware LLC and/or appointing a liquidating trustee. To the contrary, the statute reads more broadly by using a simple "cause" standard which, in my opinion, leaves to the Court the discretion to make a fact-specific determination on a case-by-case basis of the advisability of intervening to wind up a Delaware LLC.

Having conducted a two day trial, examined the record and considered the credibility of the witnesses, I conclude that cause has been established for the Court to intervene in the wind up of Alliance and appoint a liquidating trustee to assist in that effort. In short, the record amply demonstrates that the parties are deeply divided over the wind up of Alliance and, in particular, that Global has been unwilling to conduct the wind up process in an orderly and timely manner. Indeed, the record shows that, ever since Comerica decided to terminate the Service Agreement, as it was entitled to do, Global has taken a confrontational approach that is antithetical to the obligation to wind up Alliance promptly so as to maximize the value of the property (*i.e.*, merchant agreements) to be distributed to its members.

Shortly after learning that Comerica would not reconsider its decision to terminate the Service Agreement, Global cut off Comerica's access to the MAS system, preventing Comerica from conducting fraud monitoring. While the interruption in service lasted

30

only 24-48 hours, this was an egregious act for which there is no excuse.[114] On the heels of this incident, Global conducted a "fact-finding mission" to identify any "special benefits" it was providing to Comerica. Although the record does not reflect whether Global took any further retributive actions against Comerica as a result of this inquiry, this incident provides another telling indication of Global's hostile attitude toward Comerica after it elected to terminate the Service Agreement.

By early January 2014, it was apparent that Alliance would be dissolved.[115] Global promptly tripled the fees it would charge for "Services" during the transition period and, from this point forward, delayed the wind up process. On January 17, 2014, Comerica asked Global to meet to discuss a split of the Merchant Portfolio. Global stalled and did not engage in such a discussion until over three months later, on April 25. On February 4, 2014, Comerica made its first merchant split proposal. Global did not make a counterproposal until over two and one-half months later, on April 18.

Instead of moving forward to accommodate Comerica's request to transition to a new payment processor as soon as possible, Global "worked backwards" from the last

---

[114] Global attempts to mitigate the seriousness of this act, arguing that the MAS system still could be accessed by Global and "only" Comerica's access to the system was cut off. Post-Trial Oral Argument Tr. 86 (July 22, 2014). This is no justification. Comerica did not know at the time that the MAS system remained operational and, in any event, was entitled to have its own access to the system.

[115] JX 19 (January 10, 2014 letter from Comerica to Global stating that "Comerica will be terminating and winding down its Joint Venture with Global"). I reject Global's suggestion that the Court turn a blind eye to its conduct before the notice of dissolution was formally issued on May 14, 2014. Such an approach would exalt form over substance. The record plainly shows that Global knew by January 2014 that the Service Agreement had been terminated and that Alliance was headed for dissolution.

possible date to complete the transition (*i.e.*, January 31, 2015) and planned its efforts based on an arbitrarily prolonged schedule. When it finally came to the table to discuss a merchant split, Global imposed numerous conditions on its own proposals. Even at the time of trial, Global was unwilling to commit unconditionally to a merchant split acceptable to Comerica that *Global had proposed* despite arguing to this Court that a liquidating trustee was unnecessary since the merchant split was effectively completed.[116]

Comerica is not blameless for some of the delays that have occurred in winding up Alliance. It did not provide Global with the details of the type of information it needs to transition to a new payment processor until June 19, about three weeks after filing suit, and, as of trial, no communications had occurred between its new payment processor (Vantiv) and Global to discuss the transition process.[117] Any delays caused by Comerica,[118] however, pale in comparison to the concerted efforts Global undertook to string out the wind up process as long as possible to Comerica's detriment.

---

[116] Def.'s Pre-Trial Br. 37 ("[T]he merchant portfolio is almost completely divided, and there is no reason, and certainly nothing in the record, to suggest that the parties will not agree on a division or method of dividing the rest. With the sole pleaded reason for having a liquidating trustee disposed of, what purpose would be served by appointing one?").

[117] Trial Tr. 221 (Schaeffer).

[118] Comerica points out, correctly, that the parties must reach agreement on a merchant split before the migration process can begin. Nonetheless, it appears to me that progress on the data mapping necessary to implement the data conversion could have been achieved before a split is finalized by opening the lines of communications between Global and Vantiv to assess what needs to be done to convert the data from one processing system to another.

This Court has held on numerous occasions that managers of a Delaware LLC owe fiduciary duties as a default matter.[119] Although the contours of those duties may be different after dissolution of an LLC during the wind up period,[120] they continue to encompass, in my view, an obligation to distribute the assets of the company promptly consistent with maximizing their value.[121] The fundamental problem I perceive from the record is that Global, instead of embracing the obligation to wind up Alliance's affairs promptly to serve the best interests of all its members, has overreached by acting purely out of its own self-interest to delay the wind up, thereby making Comerica's transition to one of Global's competitors unduly difficult and extending for as long as possible Global's opportunity to charge Alliance fees at triple the price it previously charged. In sum, considering all the evidence, the history of parties' disputes and the manner in

---

[119] *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660-63 (Del. Ch. 2012). The parties have not identified any provision of the Alliance LLC Agreement eliminating or displacing the existence of fiduciary duties. After trial, Global argued that the members continue to owe fiduciary obligations post-dissolution. Post-Trial Oral Argument Tr. at 47-48 (July 18, 2014).

[120] *See Dionisi v. DeCampli*, 1995 WL 398536, at *9-10 (Del. Ch. June 28, 1995) *amended*, 1996 WL 39680 (Del. Ch. Jan. 23, 1996) (duty of loyalty not to seize corporate opportunities expired with expiration of joint venture); *Wagamon v. Dolan*, 2013 WL 1023884 (Del. Ch. Mar. 15, 2013) (granting summary judgment against the claim for breach of fiduciary duty for competing with the dissolved joint venture but not granting summary judgment for a breach of fiduciary duty claim asserting the assets were not properly liquidated and distributed).

[121] *See* JX 5 § 21.3.1(c) (requiring the Members of Alliance to wind up the Company in accordance with the Delaware Act upon the dissolution and authorizing them "to take any and all actions contemplated by the Delaware Act as permissible, including, without limitation, … distributing the Property as promptly as is consistent with obtaining its fair value.").

which Global has behaved to date, I have no confidence that the wind up of Alliance will be completed in a prompt and orderly manner if Global is left to its own devices.

For all the foregoing reasons, I conclude that ample cause exists for the Court to intervene in Alliance's wind up and to appoint a liquidating trustee to oversee this effort. An order appointing a liquidating trustee accompanies this Memorandum Opinion. I have included in this order the requirement that the transfer of the information necessary to perform an *en masse* migration of data sufficient to permit Comerica and its new processor to provide uninterrupted card processing services to those merchants transferred to Comerica in the merchant split occur as soon as is reasonably practicable but in no event later than January 31, 2015. Based on the testimony of Global's own witness, this deadline should be readily achievable.[122]

In accordance with this Court's statutory authority to intervene in the wind up, I also am entering a separate order to implement the split of the Merchant Portfolio to which the parties have agreed.

## IV. CONCLUSION

For the foregoing reasons, judgment is entered in Comerica's favor on Count III of the Verified Complaint insofar as it seeks the appointment of a liquidating trustee. An implementing Order accompanies this Memorandum Opinion.

---

[122] Trial Tr. 431 (Nanton).

34

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| COMERICA BANK, a Texas Banking Association, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 9707-CB |
| GLOBAL PAYMENTS DIRECT, INC., a New York Corporation, | ) ) ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| GLOBAL PAYMENTS COMERICA ALLIANCE, L.L.C., a Delaware Limited Liability Company, | ) ) ) ) | |
| Nominal Defendant. | ) ) | |

## ORDER AND PARTIAL FINAL JUDGMENT

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED this 1st day of August, 2014, for the reasons stated in my August 1, 2014 Memorandum Opinion, that:

1. Defined terms have the meaning set forth in the Memorandum Opinion.

2. Judgment is entered in favor of Comerica and against Global on Count III of the Verified Complaint insofar as it seeks the appointment of a liquidating trustee. Judgment on the remaining issues implicated in Count III is entered in accordance with my August 31, 2014 Memorandum Opinion.

3.     Finding no just reason for delay, the Court, under Rule 54(b), directs the entry of final judgment on Count III of the Verified Complaint.

_____
Chancellor

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

COMERICA BANK, a Texas
Banking Association,

        Plaintiff,

    v.

GLOBAL PAYMENTS DIRECT,
INC., a New York Corporation,

        Defendant,

        and

GLOBAL PAYMENTS COMERICA
ALLIANCE, L.L.C., a Delaware
Limited Liability Company,

        Nominal Defendant.

C.A. No. 9707-CB

## ORDER APPOINTING LIQUIDATING TRUSTEE

WHEREAS, pursuant to the Memorandum Opinion issued on August 1, 2014, this Court directed among other things, that Global Payments Comerica Alliance, L.L.C. ("Alliance" or the "Company") shall be wound up under the supervision and authority of a liquidating trustee appointed by the Court;

WHEREAS, this Court appoints Collins J. Seitz, Jr., Esquire as the liquidating trustee (the "Liquidating Trustee"); and

WHEREAS, the Liquidating Trustee shall possess the broadest authority, consistent with the Delaware Limited Liability Company Act (the "Act"), to oversee the dissolution and winding up of Alliance.

NOW, THEREFORE, this 1st day of August, 2014, IT IS ORDERED as follows:

1.    DISSOLUTION AND WINDING UP: Pursuant to 6 *Del. C.* § 18-802, the Court, having concluded that Alliance was dissolved on May 14, 2014, hereby orders that Alliance's affairs shall be promptly wound up by the Liquidating Trustee under the direction of this Court in accordance with the Act and the limited liability company agreement of Alliance (the "LLC Agreement").

2.    APPOINTMENT OF LIQUIDATING TRUSTEE: Pursuant to 6 *Del. C.* § 18-803(a), Collins J. Seitz, Jr., Esquire is hereby appointed Liquidating Trustee of Alliance with the powers and duties specified in the Order.

3.    ACCEPTANCE AND TERM OF APPOINTMENT: The Liquidating Trustee shall file in this Court a written acceptance of the appointment. The Liquidating Trustee shall serve at the pleasure of the Court and the provisions of this Order shall remain in effect pending further Order of the Court.

4.    GENERAL POWERS: The Liquidating Trustee shall have all the powers generally available to a trustee, custodian, or receiver appointed pursuant to 6 *Del. C.* § 18-803, unless the exercise of any said power would be inconsistent

with any specific provision of this Order or any other Order entered by the Court in this action. Upon appointment, the Liquidating Trustee shall have full control and dominion over the dissolution and liquidation of Alliance; *provided, however,* that until a merchant account is transferred to a new platform or the Company's obligation to process transactions for the merchant account is terminated, in order to avoid any disruption in processing services, the Company shall continue to process transactions of the merchant account in the same manner as before the dissolution. Notwithstanding the foregoing, the Liquidating Trustee is authorized and empowered, in the Trustee's sole discretion, to delegate such responsibilities to the Members and/or agents of Alliance, including Global. The Liquidating Trustee shall have access to all books and records of Alliance and the record in this action.

5. AUTHORITY TO ACT: The Liquidating Trustee is authorized and empowered to act through and in the name of Alliance as necessary (a) to carry out all duties hereunder; (b) to distribute and/or cause to be distributed all of Alliance's property and information to each of the Members as appropriate in order to wind up Alliance and cause the equitable division of Alliance property; and (c) to execute and/or deliver, or cause to be executed and/or delivered, all assignments, instruments and documents, including without limitation, the date, documents and/or other instruments concerning the transferred merchant accounts and/or necessary to transfer Alliance's interest in the merchant portfolio to the Members

in accordance with their agreed division at a time consistent with the parties' agreements, and any Court orders. The transfer of interests and information shall occur as soon as is reasonably practicable, and in any event no later than January 31, 2015, in a manner and form (electronic where possible) sufficient to permit Comerica and its new processor to provide seamless and uninterrupted card processing services to those merchants transferred to Comerica in the split. Any confidential and proprietary information or documents that concern Comerica's share of the merchants that was not immediately necessary to the continuation of processing services shall be transferred from Alliance to Comerica as soon thereafter as is reasonably practicable. If a dispute arises between the Members regarding the transfer of information to Comerica, either Member may bring the dispute to the attention of the Liquidating Trustee, who has the power and authority to resolve such disputes, with or without instructions from the Court under paragraph 7 below.

Unless otherwise specified (a) in an Opinion or Order of this Court, (b) pursuant to an agreement between the Members, or (c) determined to be necessary by the Liquidating Trustee, the Liquidating Trustee shall refer to and use the parties' Joint Exhibit 76 to determine the data, documents and instruments that shall be transferred to Comerica and its new processor within the time period set

forth in the Order. The Liquidating Trustee shall require Alliance and Global to cooperate and coordinate with Comerica and its new processor with respect to the transfer of information to Comerica.

6.    WAIVER OF DUTIES:    The provisions of Court of Chancery Rules 149-168, pertaining to the duties of a receiver and/or Liquidating Trustee for corporations are hereby waived and the Liquidating Trustee shall not be required to post a bond. In lieu of these provisions, the Liquidated Trustee shall provide interim summary reports to the Court every two weeks following the date of this Order, until the winding up is complete.

7.    REPORTS TO AND CONSULTATION WITH MEMBERS:    The Liquidating Trustee may, to the extent deemed practical or necessary, consult with the Members and/or their representatives with respect to the Trustee's performance of his or her various duties under this Order, but shall not be subject to their direction or control, and shall not be required to take any course of action the Members otherwise would or would not take. The Liquidating Trustee may periodically confer with the Members and/or their representatives by teleconference or in person, and, at the Liquidating Trustee's sole discretion, may meet with the Members and/or their representatives individually or together. At any time, either Member may request assistance or action from the Liquidating Trustee. Such conferences shall occur at such intervals as the Liquidating Trustee

deems appropriate, with the agenda for such conferences determined in advance to the extent reasonably possible. The Members, Alliance and their employees and agents shall cooperate with the Liquidating Trustee and each other to wind up Alliance and distribute Alliance property and information as required by the LLC Agreement. The Liquidating Trustee also shall have authority, but shall not be required, to petition this Court for instructions at any time from time to time.

8. PRESUMPTIONS; GOOD FAITH RELIANCE: All actions taken by the Liquidating Trustee pursuant to this Order in the right of Alliance to cause Alliance to take action shall be presumed to be taken on an informed basis, in good faith, and in the honest belief that such actions taken were in the best interests of the Company. In causing Alliance to take action, the Liquidating Trustee shall be fully protected to the fullest extent permitted by 6 *Del. C.* § 18-406 in relying in good faith upon the records of Alliance and upon information, opinions, reports or statements presented by another Member, an officer or employee of Alliance or by any other person as to matters the Liquidating Trustee reasonably believes are within such other person's professional or expert competence, including information, opinions, reports or statements as to contracts, agreements or other undertakings that would be sufficient to pay claims and obligations of Alliance or to make reasonable provision to pay such claims and obligations, or any other facts

- 6 -

pertinent to the distribution of Alliance's Property (as defined in the LLC Agreement).

9.　　INDEMNIFICATION/ADVANCEMENT AND EXCULPATION: The appointment of the Liquidating Trustee hereunder shall be binding upon the officers, managers, employees, directors and Members of Alliance. The Liquidating Trustee shall have no liability to Alliance, its Members, or any other person for acts taken in good faith pursuant to this Order, and none of the Members, nor any other person purporting to act as a director, manager, officer, employee, advisor or Member of Alliance shall institute any legal proceeding other than in this Court challenging any action, recommendation, or decision by the Liquidating Trustee in performing the duties hereunder. The Liquidating Trustee shall be entitled to all protection, limitation from liability, and immunity available at law or in equity to a Court-appointed Liquidating Trustee including, without limitation, all protection, limitation from liability, and immunity provided by the indemnification provisions of applicable law. Expenses, including attorneys' fees, incurred by the Liquidating Trustee in defending any civil, criminal, administrative or investigative action, suit or proceeding arising by reason of or in connection with the Liquidating Trustee's designation as Liquidating Trustee for Alliance, or in the performance of the duties hereunder, shall be paid by the Member who brought suit, in advance of the final disposition of such action, suit or proceeding

- 7 -

subject to the repayment of such amount if it shall be ultimately determined by this Court that the Liquidating Trustee is not entitled to be indemnified under applicable Delaware law.

10. CANCELLATION: Upon completion of the winding up of the Company and the distributions of the proceeds of dissolution pursuant to Section 21.3.2 of the LLC Agreement, the Liquidating Trustee shall execute and file a certificate of cancellation in the Office of the Secretary of State of the State of Delaware.

11. COMPENSATION OF THE LIQUIDATING TRUSTEE: The Liquidating Trustee shall be compensated by Alliance at his usual hourly rate. Reasonable travel and other expenses incurred by the Liquidating Trustee shall be paid directly to the Liquidating Trustee by Alliance. The Liquidating Trustee shall petition the Court on a monthly basis, or at such other interval as the Court may direct, for approval of fees and expenses. Any fees and expenses approved by the Court shall be paid promptly by Alliance.

12. AUTHORITY TO RETAIN ADVISORS: If necessary the Liquidating Trustee may retain counsel or other advisors to advise the Liquidating Trustee with respect to his or her duties under this Order, the Act and the LLC Agreement. If the Liquidating Trustee is an attorney, the counsel retained by the Liquidating Trustee may be the law firm of which the Liquidating Trustee is a

partner. The fees of counsel so retained shall be calculated on the same hourly rate charged by such counsel to clients represented outside of this matter and as the expenses shall be calculated for other clients. The fees and expenses of such counsel shall be paid by Alliance.

13. <u>RESERVATION OF JURISDICTION</u>: The Court reserves jurisdiction over this matter, including jurisdiction to consider any applications that the Liquidating Trustee may make for the Court's assistance in addressing any problems encountered by the Liquidating Trustee in performing his or her duties hereunder and any applications by any party arising out of or related to any action or decision of the Liquidating Trustee or any of his or her agents.

IT IS SO ORDERED.

_____
Chancellor

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

COMERICA BANK, a Texas
Banking Association,

        Plaintiff,

        v.

GLOBAL PAYMENTS DIRECT,
INC., a New York Corporation,

        Defendant,

        and

GLOBAL PAYMENTS COMERICA
ALLIANCE, L.L.C., a Delaware
Limited Liability Company,

        Nominal Defendant.

C.A. No. 9707-CB

## ORDER ON DIVISION OF MERCHANT ACCOUNTS

WHEREAS, Global Payment Comerica Alliance, L.L.C. ("Alliance") was

formed pursuant to a Limited Liability Company Agreement ("LLC Agreement")

between Plaintiff Comerica Bank ("Comerica") and Defendant Global Payments

Direct, Inc. ("Global"). Comerica and Global are the two "Members" of Alliance.

WHEREAS, on July 31, 2014, Comerica filed a Motion for Entry of An

Order to Divide Merchant Accounts (the "Motion") in accordance with an

agreement Comerica and Global reached during this litigation to divide the merchant accounts as of May 31, 2014;

WHEREAS, Exhibit A to the Motion lists those merchant accounts, by number, that the Members agreed are to be distributed to Comerica;

WHEREAS, Exhibit B to the Motion lists those merchant accounts, by number, that the Members agreed are to be distributed to Global.

IT IS HEREBY ORDERED this 1st day of August, 2014, that the merchant accounts of Alliance are divided and shall be distributed as follows:

1. The merchant accounts listed in Exhibit A to the Motion are allocated to and shall be distributed to Comerica;

2. The merchant accounts listed in Exhibit B to the Motion are allocated to and shall be distributed to Global;

3. For those merchant accounts added to Alliance after May 31, 2014, the parties shall agree on the division of those accounts or shall seek assistance from the liquidating trustee appointed by the Court to resolve any disputes concerning that division.

_____
Chancellor